Filed 4/23/26  P. v. Cardarelli CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SHAUN CARDARELLI,<br><br>    Defendant and Appellant. | B337513<br>(Los Angeles County Super. Ct. No. KA121884) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Jr., Judge.  Affirmed.

Boyce & Schaefer and Laura Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Amanda V. Lopez and Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

Shaun Cardarelli appeals from a judgment after a jury found him guilty of murder and conspiracy to commit arson and found true the special circumstance that Cardarelli committed the murder while engaged in a robbery. Cardarelli contends his counsel was ineffective for failing to object to and stipulating to the admission of three sets of hearsay evidence. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Prosecution's Case*

1.  *The participants*

When they were 15 years old, friends A.S. and S.B. ran away from their foster home and lived with 18-year-old Elijah Rouse in his apartment. While living there, A.S. would have sex with men for money. Rouse would set up appointments for A.S. and take pictures of her for the men. A.S. would give money she made to Rouse. Sometimes after A.S. had sex, Rouse would rob the man using a knife that had a red handle and no tip.

A.S. also had frequent contact with 37-year-old Cardarelli, whom she referred to as "uncle" because he used to date her aunt. S.B. overheard Cardarelli and Rouse talking about using A.S. to lure men to the apartment so they could rob them.

2.  *The murder of John Aguila*

On August 20, 2019, Cardarelli texted A.S., "You said to let you kno the plan. What plan?" A.S. responded, "what U wanted to do," adding, "my roommate/BF" "that's who I'm staying with." Cardarelli stated he would contact A.S. when he found his stolen car.

In the early morning of August 21, A.S. texted Cardarelli that she had "clients" coming over. Cardarelli asked if he was

2

supposed to be present, told her to be safe, and then again asked if she needed him there.

An hour later, A.S. texted Cardarelli that she had a client on his way. A.S. texted, "[Rouse] said it would be easier nn more quiet if your here." She added, "So yea. Go ahead n come." Cardarelli responded, "I think he is right I should be there," adding, "I so wish you would have told this to me sooner." Several hours later, Cardarelli asked A.S., "How did everything go?" A couple hours later, she sent him multiple photos of herself, including some in which she was only partially clothed.

That evening, Cardarelli texted A.S. that he could "help out" by coming to the apartment and asked, "What time is this going to happen?" A.S. responded, "We waitin on reply [but] we have a couple others as well." Cardarelli later texted that he was on his way. That same evening, A.S. had a man over to the apartment who was going to pay for sex. The man was smoking with A.S. and S.B. S.B. texted A.S. to tell Rouse that they should not do "it," referring to robbing the client. S.B. also texted Rouse that "we not gone do that to this one." Rouse responded, "Do what??" He texted that the next customer was coming and also that "uncles on his way." S.B. replied that she knew that because she and A.S. were just on the phone with "uncle." They talked about "uncle" needing a ride or taking the train.

In the early morning of August 22, Cardarelli texted A.S. asking her if she was happy he was at the apartment. Later that day, Rouse texted an acquaintance, Davone Smith, and stated he needed to talk with him but not over the phone. Rouse told Smith to come over later that evening "cuz someone gonna get" and then sent a water gun emoji, which Smith interpreted as someone was going to get hurt. Rouse had repeatedly asked

3

Smith for a gun in the days before the murder in order to "rob somebody."

In the evening of August 22, John Aguila messaged an app account associated with A.S. and scheduled "an appointment" with A.S. and another girl after a price was agreed upon. Rouse, who was operating the account and pretending to be A.S., sent a photo of A.S. topless. Aguila asked the girls' ages, and Rouse replied they were 19 and 22. Rouse sent the address of his apartment, and Aguila said he would be there around 6:00 p.m.

When Aguila set up the appointment, Cardarelli, Rouse, A.S., and S.B. were at the apartment. Rouse and A.S. told S.B. that Aguila was coming to the apartment. Rouse stated he and Cardarelli were going to rob Aguila. He and Cardarelli practiced how they were going to do it, including how they were going to put Aguila in a chokehold and choke him out. Rouse demonstrated doing a chokehold. Cardarelli participated in the conversation.

At 5:28 p.m., S.B. texted A.S. that she wanted to die. She texted half an hour later that she was scared. A.S. responded that she was scared, and S.B. replied, "Me too." Minutes later, A.S. texted S.B. that Cardarelli looked like he was about to cry. S.B. replied, "FR," meaning "for real," and A.S. responded, "Yea." Minutes later, S.B. texted A.S., "When it happens, please don't just sit there" and "I don't want you to have to go through dat." A.S. responded, "I would rather it be me then you." Minutes later, A.S. texted S.B., "What if the dude has a gun?" S.B. responded, "Uughhhh." S.B. texted Rouse asking him to get her some water. Rouse texted, "Not right now. Wait till we are done." S.B. then asked Rouse if the client was even coming. Rouse replied that he was there.

4

At 6:18 p.m., Aguila indicated he had arrived outside the apartment. A.S. texted S.B. that Aguila was coming up right now. S.B. went into a bedroom before Aguila arrived while Rouse and Cardarelli remained in the living room. S.B. repeatedly texted A.S. to come in the bedroom with her.

Within a minute of Aguila entering the apartment, S.B. heard an argument and A.S. ran into the bedroom with her. S.B. heard struggling and what sounded like a fight. Aguila yelled for help. Rouse or Cardarelli shouted, "Shut the fuck up." S.B. heard struggling for approximately 10 to 30 minutes out in the hallway. She could hear someone being hit.

After it got quiet, A.S. exited the room and S.B. followed. Cardarelli and Rouse looked exhausted and had blood on them. Rouse had blood "everywhere," include on his face, hands, and clothes. Cardarelli had blood on his shirt. Aguila was dead and laying with his legs in the hallway and his upper body in the other bedroom. He had a blanket placed over him. S.B. saw the knife that Rouse used in the prior robberies. Two bookends and the knife had blood on them. There were bloodstains on the carpet and throughout the bedroom.

The autopsy showed Aguila suffered blunt force injuries all over his head, including a fractured skull, nose, and jaw, chipped teeth, and injuries to his lips, chin, and scalp. He had sharp force injuries to his face, including multiple stab wounds to the eye and a slice on his neck. The forensic examiner opined that the cause of death was blunt and sharp force injuries causing brain damage and blood loss. He opined that the injuries "shook the brain itself and that would have caused the bleeding found in the brain." The blood loss from the stab wounds also contributed to the death.

5

3.    *The aftermath*

After the murder, Cardarelli, Rouse, A.S., and S.B. got in Aguila's car and went to the store so Cardarelli could get cigarettes.  At some point, Rouse threw the knife and bookends in a dumpster.  When they were back at the apartment, Rouse stated they needed to get rid of the body, and Cardarelli agreed.  Rouse stated their best option was to burn it, and Cardarelli suggested a camping area.  Rouse had A.S. contact Smith for assistance, thinking he would know what to do, in part because Smith was a gang member.

When Smith arrived, he sold drugs to Cardarelli, Rouse, and A.S., and they all smoked methamphetamine.  They also showed Smith the body, which had been wrapped in plastic wrap and blankets.  Rouse told Smith that Aguila tried to rape A.S., and he "had to do what he had to do."  Rouse told Smith he stabbed Aguila in the eye and hit him with a "little statue."  He stated Aguila was about to "get away," and Cardarelli "helped out."  Cardarelli, who was present, did not dispute this version of events, nor did he act surprised, angry, or upset about what happened.  At some point, Cardarelli, Rouse, and Smith left the apartment and purchased more methamphetamine.

Around midnight, Cardarelli, Rouse, and Smith brought Aguila's body to the trunk of Aguila's car.  Smith drove Rouse in one car, and Cardarelli drove Aguila's car alone.  Both cars stopped at a gas station where Rouse filled a water bottle with gasoline, and Cardarelli went inside to pay.  They drove to San Antonio Heights, where they stopped and put Aguila's body in a ditch on the side of the road.  Rouse poured gasoline on it, and Smith set it on fire.  They fled the scene.

Cardarelli, Rouse, and Smith returned to the apartment, where they drank alcohol and the atmosphere was one of "celebration." Rouse told S.B. that he stabbed Aguila in the neck and eye. Rouse stated he was trying to choke Aguila, but he gave up and stabbed him. Cardarelli stated he "was hitting" Aguila. At some point, S.B. learned that A.S. was texting people about the murder. A.S. told S.B. she had posted about the murder on social media and was going to take the blame if anything happened.

In the early morning of August 23, Smith took Cardarelli home. During the drive, Cardarelli stated something along the lines of "[Rouse] started beating the guy up and [I] had to help out and finish him."

4. *The arrests and law enforcement investigation*

Aguila's body was discovered burning in the early morning of August 23, but it was not immediately identifiable. Law enforcement later received a missing person report regarding Aguila. They also obtained a search warrant for Rouse's apartment after retrieving messages from Aguila's cell phone that showed the communications with A.S. regarding sex.

On August 27, law enforcement arrived at the apartment and instructed the occupants to exit. Cardarelli came out the front door after eight minutes. Rouse and A.S. tried to escape by climbing out a window and onto the roof. While on the roof, Rouse tried to cover himself with his shirt and conceal himself behind the eaves. A.S. fell off the roof and broke her arm. Aguila's financial cards and driver's license were found on the roof. His car key fob was found in a garbage can outside the apartment. Rouse had small cuts on his hands. He had photos on his phone of Aguila's body wrapped in blankets and Aguila's

7

possessions. A.S. also had photos of the crime scene and Aguila's body on her phone.

Cardarelli and Rouse were placed in jail cells next to each other. In a recorded conversation, Rouse stated he had an idea that Cardarelli may not like. He proposed letting A.S. "take the fall" because she was a juvenile, and Cardarelli replied, "Yeah, that's fine with me." Rouse proposed the story that they were not present during the murder and when they returned A.S. had killed the person she was hooking up with because he was aggressive. Cardarelli replied, "Okay." Rouse told Cardarelli to call people and see if he could get an alibi.

In a recorded conversation with a jailhouse informant, Cardarelli was mostly quiet but stated he did not know why he had been arrested and blamed Rouse for why he was in jail.

Law enforcement also recorded a conversation between Rouse and a jailhouse informant. Rouse stated he had no idea why he had been arrested. He then stated he and Cardarelli left the apartment and when they returned A.S. had stabbed some man. Finally, he stated A.S. had someone over for sex who became aggressive, so Rouse fought the man and A.S. stabbed him to death.

The next three recorded conversations that were played for the jury, two involving Rouse and one involving A.S., are at the heart of Cardarelli's argument on appeal.

In a recorded jail phone call with his aunt, Rouse stated a few days ago he was "with the homegirl and the homies and the homie he just got robbed." When his aunt asked if he had talked to an attorney, Rouse stated, "I'm already guilty, Auntie." He stated he did what "they" told him to do; he held Aguila while others went through his pockets, expecting they would then let

8

Aguila go.  But "then they just stabbed and then I just left" and "[w]hen I came back, there was a dead body in my house."  Rouse stated he had "some leverage," noting "the person I was with, they posted it on social media that they killed him.  Admitting that they did it."  Rouse stated he would "admit to holding someone down" and "being an accessory" but would "not admit to murder.  Something I did not do."  He repeatedly stated he was not a murderer and did not "kill him."

The next recorded conversation was part of a *Perkins* operation[1] involving A.S.  A.S. had previously told law enforcement she and Rouse had stabbed Aguila during a drug sale that S.B. had set up.  A detective came to her jail cell and played the recording of Rouse and Cardarelli planning to pin the murder on her.  After the detective left, A.S. told her cellmate (an informant) she "didn't touch anything or anybody" and she had "made up lies."  A.S. stated that instead Rouse and Cardarelli were going to "jack" Aguila and ended up "beating the shit out of" and killing him while she and S.B. hid in the bedroom.  She stated that, after the murder, Rouse told her to clean the mess or else she would "end up looking like" Aguila.

Finally, in a recorded interview with law enforcement while in jail, Rouse acknowledged he communicated with men for A.S. to have sex with and that A.S. paid him money she received from having sex with the men.  He stated Cardarelli did not "pimp" A.S., emphasizing "[t]hat's her uncle."  As for the murder, Rouse stated he attacked Aguila because Aguila became rough with A.S.

---

[1]     A "*Perkins* operation" is when an undercover operative is placed in a cell with the suspect to obtain information from the suspect.  The term derives its name from *Illinois v. Perkins* (1990) 496 U.S. 292.

during sex. Rouse stated it was A.S. who then stabbed Aguila. Rouse did not mention Cardarelli being present. He stated A.S. told others she had stabbed Aguila in the eye and killed him. He denied planning a robbery.

After being pressed, Rouse stated Cardarelli was in the apartment and hit Aguila with a wooden figurine during the struggle. Again, he denied it was a robbery, explaining he was there to "protect" A.S. and Cardarelli was "just there 'cause that's her uncle." Rouse stated Cardarelli was high on methamphetamine and asleep on a couch, did not react until Rouse responded to A.S.'s cries, and only helped once A.S. had stabbed the victim.

Finally, Rouse changed his story again and stated Cardarelli and A.S. proposed a robbery because Cardarelli needed money, and Rouse just helped. Rouse stated he and Cardarelli entered the room where Aguila and A.S. were and Cardarelli "roughed [Aguila] up" and Rouse "choke[d] him out." Rouse stated Cardarelli was the one who stabbed Aguila. Rouse stated he gave Aguila's money to Cardarelli because he "needed all of it." Rouse later stated he split the money up between himself, Cardarelli, and A.S.

During the interview, Rouse acknowledged he had a cut on his hand that he admitted was from a knife and occurred during the struggle, but he denied being the stabber. He stated he was "[c]lueless" as to how he got the cut but suggested it might have happened while he was "fucking around" with knives, something he often did.

10

B.    *The Defense's Case*

Cardarelli testified at trial.  Cardarelli met A.S. through her aunt, whom he had previously dated for almost two years. On the day before the murder, A.S. told Cardarelli that she was prostituting.  He asked who would pay for sex with a 15 year old. Shortly after that, A.S. sent him the semi-nude photos, which he deleted, and he called to tell her she should not be doing that and to never send him photos like that again.  On cross-examination, the prosecution asked Cardarelli about evidence showing he subsequently messaged A.S. telling her to send him photos. Cardarelli stated he did not remember the messages.

Cardarelli went to Rouse's apartment the night before the murder.  That was when he first met Rouse.  On cross-examination, the prosecution presented evidence showing a text from Cardarelli's phone number to Rouse's phone number that was sent 10 days before the murder.  Cardarelli stated he did not remember this message.

On the night before the murder, A.S. told Cardarelli that clients would sometimes get into arguments with Rouse because they wanted her to leave with them.  She and Rouse wanted another person there.  When A.S. texted that "[Rouse] said it would be easier nn more quiet if your here," Cardarelli thought she was talking about his being there to minimize the noise of Rouse's arguments with clients seeking to get A.S. to leave with them.  Even though he responded that he thought Rouse was right and that he should be there, Cardarelli "never had the intent to go there or to be a part of it."

On the day of the murder, Cardarelli made excuses why he could not go to the apartment.  He called A.S. and told her he did not want to be part of the prostitution.  Over the phone, A.S.

11

stated she did not want to prostitute, but Rouse would not let her leave. She stated she needed Cardarelli to come to the apartment and pick her up. Cardarelli arrived at the apartment in the early afternoon. A.S. and S.B. kept making excuses about why A.S. could not leave. At some point, Rouse confronted Cardarelli, and Cardarelli told Rouse he "came here not to do what he's expecting" but rather "just to pick [A.S.] up and to leave." At that point, Cardarelli wrestled Rouse, and Rouse overpowered him. Rouse threatened Cardarelli and told him to sit on the couch and do what he was told. The look in Rouse's eyes scared Cardarelli and made him fear for his life.

Aguila arrived several hours later. When Aguila entered the apartment, Rouse acted like he knew him. A.S. and S.B. were in a bedroom with the door shut. Rouse escorted Aguila to the bedroom, but when Aguila looked in, no one was there. As Aguila turned around, Rouse struck him in the face with an object, and Aguila fell. Rouse started violently striking and kicking Aguila in the face and head. When Aguila tried to get up, Rouse jumped on his back and started choking him. At that point, Rouse screamed for A.S. and told her to get his "tool." Aguila was back on the ground and trying to get up. Rouse kicked him in the face and then used the knife that A.S. brought from the kitchen to slice Aguila's neck. Rouse then repeatedly stabbed Aguila in the face.

Cardarelli approached and stated Aguila was not going to get up, and "it's enough." Rouse pushed Cardarelli, and Cardarelli hit his elbow on the door as he fell to the ground. Rouse came toward Cardarelli with the knife and asked if he wanted to be next. Rouse told him to sit on the couch and shut up, and stated he would kill A.S., S.B., and Cardarelli's family

and roommate if he did not cooperate. Rouse returned to Aguila and kicked him in the head.

A.S. came out of the bedroom and talked in a low voice with Rouse in the hallway. She came into the living room and took Cardarelli's two phones and stated he needed to cooperate with Rouse to get out of this. Cardarelli helped wrap up the body because Rouse told him to. Rouse made Cardarelli strip down because there was blood on his shirt from where Rouse pushed him. Rouse gave him new clothes to wear.

Rouse made Cardarelli drive them to Compton in Aguila's car to try to find someone to help with the situation. They never found the person they were looking for. They then went to a gas station, and Cardarelli bought cigarettes. They drove back to the apartment, and Rouse told Cardarelli to sit and wait as he and A.S. tried to contact people.

Smith arrived and Cardarelli and A.S. smoked methamphetamine with him. After that, Rouse showed Smith the body. Rouse, Smith, and A.S. discussed what to do with the body. Cardarelli was present but did not speak because he had been told to shut up. A decision was made to burn the body later that night. Cardarelli helped move the body into a closet in the meantime. He then smoked marijuana with S.B.

Later, after Rouse and Smith failed to lift the body, Cardarelli followed Rouse's order and carried the body downstairs by himself to Aguila's car. Cardarelli drove Aguila's car and was told to follow Rouse and Smith, who were in the other car. They all went to a gas station where Cardarelli went inside and paid for the gasoline using money Rouse gave him. Cardarelli did not flee in the car because he feared Rouse's threats and still did not have one of his phones. The phone was

very important because it had addresses and contacts in it and Rouse had threatened to kill his family.

When they arrived in the mountains, Rouse and Smith pulled Aguila's body into the ditch and covered it in gasoline. After Rouse and Smith lit the fire, Cardarelli got in Aguila's car and took off while Smith drove with Rouse in the opposite direction. Cardarelli could have fled, but he was scared of Rouse's threats, hoped he could get A.S. and S.B. out of the apartment, and wanted his phone back.

When they returned to the apartment, they smoked more methamphetamine. Rouse told Cardarelli to clean the apartment, which was still a mess. At some point, Smith stated he was leaving, and Cardarelli asked for a ride. Cardarelli denied telling Smith that Rouse started the fight with Aguila and that he (Cardarelli) had to help finish it.

On August 24, two days after the murder, Cardarelli texted Rouse, A.S., and S.B., "Good afternoon. Are we having a good day?" Cardarelli testified that he did not know why he sent that message.

On August 27, the day of the arrests, Cardarelli went back to Rouse's apartment to retrieve his phone. Before Cardarelli went over, Rouse texted him from A.S.'s number, "Hey, it's [Rouse]. How far out are you[?]" Even though he saw Rouse kill Aguila and was afraid of Rouse's threats, Cardarelli still went over to the apartment. He was there for a couple hours before the police arrived. He was there that long because A.S. would not give him his phone back and she was "playing games" with him. In the days after the murder, Cardarelli never sent a message to A.S. about not having one of his phones or demanding it back and instead raised the subject "only on phone calls."

14

At the time of the murder, Cardarelli was six feet, one inch tall and weighed 190 pounds.  Rouse was smaller and lighter than him.  During their recorded jail conversation, Cardarelli was still scared of Rouse.

C.    *Charges, Verdicts, and Sentence*

The People charged Rouse and Cardarelli with first degree murder (Pen. Code, § 187, subd. (a)),[2] conspiracy to commit arson (§§ 182, subd. (a)(1), 451, subd. (d)), recklessly causing a fire of a structure or forest land (§ 452, subd. (c)), and human trafficking of a minor for a commercial sex act (§ 236.1, subd. (c)(1)).  The People also alleged the special circumstance that Rouse and Cardarelli committed the murder while engaged in a robbery (§ 190.2, subd. (a)(17)).  They further alleged Rouse and Cardarelli personally used a deadly or dangerous weapon in the commission of the murder.  (§ 12022, subd. (b)(1)).[3]

Before Cardarelli's trial, the People dismissed the recklessly causing a fire charge and struck the personal use of a weapon allegation against Cardarelli.

The jury found Cardarelli guilty of first degree murder and conspiracy to commit arson and found true the robbery special circumstance.  The jury acquitted Cardarelli of the human trafficking charge.  The court sentenced him to life in prison without the possibility of parole for the murder and a

---

[2]    Undesignated statutory references are to the Penal Code.

[3]    The People alleged additional charges against Rouse, who pleaded no contest before trial (the record does not disclose the details of his plea and conviction).

15

determinate term of two years (the middle term) for conspiracy to commit arson.

Cardarelli timely appealed.

## DISCUSSION

Cardarelli argues his defense counsel provided ineffective assistance of counsel by failing to object to the admission of three sets of hearsay evidence: Rouse's jail phone call with his aunt, A.S.'s statements during the *Perkins* operation in her jail cell, and Rouse's police interview.

A.    *Relevant Proceedings*

Defense counsel did not object when the prosecution played for the jury a recording of Rouse's jail phone call with his aunt. During the next break, the court stated it was concerned the call was inadmissible hearsay, explaining Rouse's statements were against his penal interest but expressing uncertainty as to whether Rouse was legally unavailable such that the hearsay exception for statements against penal interest could apply. The court further explained it had not raised the issue when the prosecution presented the call because it recognized that "these trial attorneys are extremely experienced" and it did not want to interfere with possible strategy. The court added it knew defense counsel had "a strategy and that's abundantly clear. And whether or not you feel this evidence even if it comes in would benefit your client in some way, which maybe it does, but I can only assume it's a strategy call for you to allow this evidence to come in . . . ."

Defense counsel responded that not objecting was a "complete strategy call," explaining, "I want as much evidence in

16

from Mr. Rouse as I could possibly get in because my position is that he is lying about my client's involvement in the murder. And calls like [the jail phone call] show that he'll lie even to his aunt about what happened, and there is a pattern of him lying. We're going to find out that that happens in his interviews with the police, that changing of stories and so forth. And that's the reason I didn't object to it and wouldn't ever object to it." The court stated it would not interfere with the strategy and would allow the admission of the call as statements against penal interest if the parties stipulated that Rouse was legally unavailable. After defense counsel and the prosecutor explained that Rouse's time to appeal following his own no-contest plea had not yet elapsed such that he still had a privilege against self-incrimination, both parties stipulated that he was unavailable.

The court then raised a related hearsay concern regarding the prosecution's prospective presentation of a recording of A.S.'s conversation with the jailhouse informant. The prosecutor argued A.S.'s statements were nontestimonial and against penal interest and that A.S. was believed to be in New York and thus unavailable. The prosecutor explained he had discussed the admission of the conversation with defense counsel before trial. Although the prosecutor was not going to play the part of the conversation in which A.S. stated she stabbed the victim, defense counsel planned to elicit those facts from the investigating detective who would lay foundation. Defense counsel explained, "I'll deal with that and change of stories which, again, falls into the only defense I have, which is everybody is changing stories and that, you know, you can't trust anything they say." Counsel reiterated, "I don't have a problem with this. Again, it allows me to get in things that maybe I would not otherwise be able to get

in." Counsel stated he had communicated with A.S.'s family, who confirmed she was in New York and indicated "there is no way in heck she's coming out to California to testify in this case." The court stated that if both parties stipulated that A.S. was legally unavailable, it would permit admission of her statements as against penal interest. Both parties so stipulated, and the prosecution presented the evidence without objection.

Finally, after these stipulations, the prosecutor indicated he also intended to present Rouse's jail interview with law enforcement. Defense counsel stated he would not object. The parties indicated they would further discuss the issue amongst themselves. The next trial day, the prosecutor again raised the issue, expressing desire to play a recording of the interview for the jury with the understanding that defense counsel would ask to play it if he did not. Defense counsel concurred, stating the interview goes "to my strategy in terms of defending [Cardarelli], and . . . there is stuff in it that helps him. There is stuff in it that helps me. So it's going both ways on here. So where it would normally be testimonial and I would be technically arguing I don't have a chance to cross-examine, but in this case I don't need to cross-examine. It's done within the statements that he makes that will get the points out that I would have gotten out had I been able to cross-examine him."

The court stated it appeared the parties wanted to stipulate to the admission of the interview and waive any legal objection. The parties agreed. The prosecutor reiterated that defense counsel "is making a strategic decision because he feels it's in the best interest of his client to play this" and agreed the evidence did "cut both ways." The prosecutor raised the possibility of this becoming an issue on appeal but stated that "[defense counsel's]

many years of doing this and his great success on cases" was "sufficient for my concern for an appellate issue." Defense counsel reiterated he was purposely not objecting, describing it as "a situation of me affirmatively wanting this [evidence] in." Counsel stated "an appellate court is not going to have an issue as to whether there is a failure to object because of strategic reasons," emphasizing "[i]t is completely a strategic decision on my part." The court permitted admission of the interview, which the prosecution later played for the jury without objection.

B.     *Defense Counsel Did Not Provide Ineffective Assistance*
       1.     *Applicable legal standards*

To demonstrate ineffective assistance of counsel, Cardarelli must show (1) his counsel's performance fell below an objective standard of reasonableness, and (2) but for counsel's error, a different result would have been reasonably probable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.) "Whether counsel's performance was deficient, and whether any deficiency prejudiced defendant, are mixed questions of law and fact subject to our independent review." (*In re Gay* (2020) 8 Cal.5th 1059, 1073.)

"Because of the difficulties inherent in making the evaluation [of counsel's performance], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Strickland, supra,* 466 U.S. at p. 689; accord,

19

*People v. Stanley* (2006) 39 Cal.4th 913, 954 [" ' "[W]e accord great deference to counsel's tactical decisions" [citation], and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" [citation]. "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." ' "].) "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." (*Strickland*, at p. 690.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009; accord, *People v. Johnsen* (2021) 10 Cal.5th 1116, 1165; *People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301.)

2.       *Cardarelli has not shown defense counsel's performance was deficient*

Cardarelli contends his defense counsel was ineffective for failing to object to the hearsay evidence and stipulating to its admission. We examine whether Cardarelli has overcome the presumption that his counsel's strategy articulated during the trial was reasonable, based on the circumstances and facts known to counsel at the time. (See *People v. Stanley*, *supra*, 39 Cal.4th at p. 954.)

Hearsay evidence is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid.

20

Code, § 1200, subd. (a).) "Hearsay is generally inadmissible unless it falls under an exception." (*People v. Sanchez* (2016) 63 Cal.4th 665, 674; see Evid. Code, § 1200, subd. (b) ["Except as provided by law, hearsay evidence is inadmissible."].) Further, if an accuser makes a formal out-of-court statement to a government officer (i.e., testimonial hearsay), then a criminal defendant's Sixth Amendment right to confront the accuser is triggered: admission of testimonial hearsay against a defendant violates the confrontation clause "unless (1) the declarant is unavailable to testify and (2) the defendant had a previous opportunity to cross-examine the witness or forfeited the right by his own wrongdoing." (*Sanchez*, at p. 680; accord, *People v. Martinez* (2018) 19 Cal.App.5th 853, 860.) While statements made during a formal police interrogation are testimonial, statements made unwittingly to a government informant are not. (*People v. Gallardo* (2017) 18 Cal.App.5th 51, 67-68; *People v. Washington* (2017) 15 Cal.App.5th 19, 28.)

"The improper admission of hearsay is an error of state law. The improper admission of testimonial hearsay is an error of federal law, in that it violates the [federal] Constitution's confrontation clause." (*People v. Martinez, supra,* 19 Cal.App.5th at p. 860.)

Cardarelli correctly contends Rouse's statements during his interview with the police were testimonial hearsay. Cardarelli asserts the admission of these statements violated his confrontation clause rights because Rouse was not subject to cross-examination. With respect to Rouse's statements in his jail phone call and A.S.'s statements during the *Perkins* operation, although they were not testimonial, Cardarelli contends at least portions of the statements were not admissible under the hearsay

21

exception for statements against penal interest. That exception permits the admission of statements by a declarant that, "when made, . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230; see *People v. Grimes* (2016) 1 Cal.5th 698, 710-711 ["[T]he rationale underlying the exception is that 'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements."].) For the exception to apply, the proponent of the evidence must show (1) the declarant is unavailable, (2) the declaration was against the declarant's penal interest when made, and (3) the declaration was sufficiently reliable to warrant admission. (*Grimes*, at p. 711.) Cardarelli argues the exception does not apply because Rouse's and A.S.'s statements shifted blame and were self-serving and thus were not sufficiently against penal interest.

Even assuming Cardarelli had meritorious objections to keep the three sets of hearsay evidence from being admitted into evidence, however, Cardarelli has not met his burden to show his counsel's performance was deficient in stipulating to the admission of the statements. As his counsel explained to the trial court, he believed Cardarelli's best defense was to rely on the many inconsistencies in other actors' statements to cast doubt on Cardarelli's participation in the crimes. Cardarelli asserts this strategy was "not sound" because neither Rouse nor A.S. testified, and thus there was no need to impeach their credibility. But it was not irrational for defense counsel to acquiesce to evidence coming in to show Rouse and A.S. repeatedly changed

their stories and pointed fingers in numerous different directions, in an effort to sow doubt as to Cardarelli's role because it was impossible to trust what any of the other participants said.

Cardarelli argues the hearsay evidence contradicted his defense and thus it was unreasonable for his counsel to allow it to come in. Indeed, defense counsel acknowledged the hearsay evidence cut both ways. In their statements, the declarants gave versions of the night of the murder that implicated Cardarelli as a participant in the robbery and murder. But they also told versions of their stories that did not implicate him at all. Moreover, some of the declarants' statements supported Cardarelli's own version of the night and provided favorable evidence for his defense. For instance, just as Cardarelli testified he spent the evening of the murder in fear of Rouse, A.S. told the jailhouse informant that she cleaned up the crime scene because Rouse told her she would "end up looking like" the victim if she did not. And Rouse unequivocally maintained in his police interview that Cardarelli did not participate in A.S.'s prostitution, providing strong evidence for Cardarelli's defense to the human trafficking charge, on which the jury ultimately found him not guilty.

Counsel's reliance on this strategy was not objectively unreasonable given the other ample and strong evidence depicting Cardarelli as an active participant in the crimes and given the inconsistencies in and inherent unbelievability of Cardarelli's own version of the events. (See *Harrington v. Richter* (2011) 562 U.S. 86, 109 ["To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates."].) It was not as if the hearsay

23

evidence provided the only evidence tying Cardarelli to the robbery, the murder, or the conspiracy to dispose of the body by burning it. Unrebutted evidence at trial showed Rouse and A.S. engaged in a pattern of robberies of men who paid to have sex with A.S. Cardarelli went to the apartment on the night one of those robberies was planned, and S.B. testified that, immediately before the murder, Rouse and Cardarelli discussed robbing Aguila and practiced how they were going to do it. Texts between Cardarelli and A.S. about Rouse and her wanting Cardarelli to be at the apartment so that "it would be easier nn more quiet" and Cardarelli agreeing and wanting to be there to "help out" also supported the conclusion that Cardarelli knowingly went to the apartment to participate in a robbery on the day of the murder. Just before Aguila arrived at the apartment, A.S. and S.B. texted about how scared they were and expressed fear that Aguila might have a gun, confirming the planned nature of the robbery. A.S. texted that Cardarelli looked like he was about to cry, strongly suggesting that he too was nervous about the robbery. Afterwards, however, Cardarelli did not seem upset or surprised about what had happened, suggesting he knew a robbery was planned and was not surprised something went wrong.

In the conversations with Smith after the killing, Cardarelli did not dispute that he had helped Rouse kill Aguila, and Cardarelli told Smith that Rouse started beating Aguila up, but Cardarelli had to step in to finish it. The evidence also showed Cardarelli helped Rouse in planning to burn Aguila's body and then in executing that plan. Thus, defense counsel was aware that even without the hearsay evidence, there was strong evidence that Cardarelli knowingly participated in the robbery of

24

Aguila and his murder, as well as the conspiracy to commit arson afterwards.

While Cardarelli asserts defense counsel never even raised the issue of Rouse's and A.S.'s credibility during closing arguments, counsel did emphasize the uncertainty in the collective evidence at trial and the doubt it created as to the actual truth of who did what. He stated: "[N]obody . . . knows who delivered a blow to Mr. Aguila that actually killed him. If we assume there [are] two people involved, we don't know that. Nobody could tell us that. The coroner can't tell us that. Nobody can. But that assumes two people are involved, and Mr. Cardarelli has told you he wasn't involved in the actual killing of Mr. Aguila. I don't know. You know, nobody knows what went wrong that day . . . ." Counsel may have determined the contradictions in Rouse's and A.S.'s statements were so obvious that they did not need special emphasis.

"Under these circumstances, we cannot say counsel was constitutionally ineffective in his attempt to make the best of a bad situation." (*People v. McPeters* (1992) 2 Cal.4th 1148, 1187, superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106.) Counsel's choice to not object to the hearsay evidence and instead use it as part of the defense strategy can be considered a rational tactical decision. Even if opinions can differ on the advisability of such a tactic, hindsight is not the proper perspective for assessing the competence of counsel's trial decisions. (*In re Valdez* (2010) 49 Cal.4th 715, 729-730; accord, *Strickland*, *supra*, 466 U.S. at p. 689; see *People v. Weaver* (2001) 26 Cal.4th 876, 928 [" 'even "debatable trial tactics" do not "constitute a deprivation of the effective assistance of counsel" ' "].) "As [Cardarelli] has failed to

show affirmative evidence that counsel could have had 'no rational tactical purpose' for these decisions, [he] has not demonstrated constitutionally deficient performance on this record." (*People v. Mickel* (2016) 2 Cal.5th 181, 200.)

## DISPOSITION

The judgment is affirmed.


                                        STONE, J.

We concur:


      MARTINEZ, P. J.



      FEUER, J.


26